Filing # 127464422 E-Filed 05/25/2021 10:48:13 AM

**IN THE COUNTY COURT OF THE TENTH JUDICIAL CIRCUIT
IN AND FOR POLK COUNTY, FLORIDA
CIVIL DIVISION**

Cimmeron Frazier,

     *Plaintiff,*

v.

National Credit Adjusters, LLC, *and*
Lee Tyler Rempel,

     *Defendants.*

Case Number:

Ad Damnum: **$12,200 + Atty Fees and Costs**

**JURY TRIAL DEMANDED**

## COMPLAINT AND DEMAND FOR JURY TRIAL

**COMES NOW** the Plaintiff, **Cimmeron Frazier ("Mr. Frazier")**, by and through his

attorneys, Seraph Legal, P.A., and complains of the Defendants, **National Credit Adjusters,**

**LLC ("NCA"),** and **Lee Tyler Rempel ("Rempel")** (jointly, **"Defendants"**), stating as follows:

### PRELIMINARY STATEMENT

1.     This is an action brought by Mr. Frazier against the Defendants for violations of

the Florida *Civil Remedies for Criminal Practices Act*, Florida Statute § 772.101, *et seq.*

("**CRCPA**"), the *Florida Consumer Collection Practices Act*, Florida Statute § 559.55, *et seq.*

("**FCCPA**"), and the *Fair Debt Collection Practices Act*, 15 U.S.C. § 1692, *et seq.* ("**FDCPA**").

### JURISDICTION AND VENUE

2.     Jurisdiction arises under the FDCPA, 15 U.S.C. § 1692k(d), the FCCPA, Florida

Statute § 559.77(1), the CRCPA, Florida Statute § 772.104, and Florida Statute § 34.01.

3.     The Defendants are subject to the provisions of the FDCPA, the FCCPA, and the

CRCPA, and to the jurisdiction of this Court pursuant to Florida Statute § 48.193 and Fed. R.

Civ. P. 4(k).

4.      Venue is proper in Polk County, Florida, pursuant to Florida Statute § 47.051, because the acts complained of were committed and / or caused by the Defendants within Polk County.

## PARTIES

### Mr. Frazier

5.      **Mr. Frazier** is a natural person residing in Lakeland, Polk County, Florida, and a *Consumer* as defined by the FDCPA, 15 U.S.C. § 1692a(3), and the FCCPA, Florida Statute §559.55(8).

### NCA

6.      **NCA** is a Kansas limited liability company with a principal business address of **327 W 4th Ave, Hutchinson, KS 67501.**

7.      NCA is registered to conduct business in the State of Florida, where its registered agent is **Corporation Service Company, 1201 Hays St., Tallahassee, FL 32301.**

### Rempel

8.      Rempel is the CEO and manager of NCA.

9.      In his capacity as manager, Rempel is the individual responsible for the determination of, and implementation of, NCA's policies and procedures.

10.     Rempel also participates directly in the day-to-day operations of NCA, including the collection of consumer debts and the purchase of consumer debts.

11.     Upon information and belief, Rempel resides at **23 Prairie Dunes Dr., Hutchinson, KS 67502.**

## DEFENDANTS ARE DEBT COLLECTORS

12.     The Defendants are *Debt Collectors* within the meaning of the FDCPA, 15 U.S.C. § 1692a(6), and the FCCPA, Florida Statute § 559.55(7), in that they use an instrumentality of commerce, including the U.S. mail and / or telephone, interstate and within the State of Florida, for their business, the principal purpose of which is the collection of debts, and / or they regularly collect or attempt to collect, directly or indirectly, debts owed or due or asserted to be owed or due another.

13.     NCA is licensed as a ***Consumer Collection Agency*** ("**CCA**") by the Florida Office of Financial Regulation, holding license number **CCA0900486. SEE PLAINTIFF'S EXHIBIT A.**

14.     As a CCA, NCA knows or should know its obligations under the FDCPA and the FCCPA.

## FACTUAL ALLEGATIONS

### Rise Makes Illegal Loan to Mr. Frazier

15.     In or around December 2019, Mr. Frazier obtained an installment loan (the "**Rise Loan**") from online lender Elevate Credit, Inc. ("**Elevate**"), doing business as Rise Credit ("**Rise**").

16.     The Rise Loan had a stated principal of $3,500.

17.     The Rise Loan was purportedly funded through **FinWise**, a small, single-branch bank in Murray, Utah.[1]

18.     Mr. Frazier used the proceeds of the loan for household expenses.

19.     The Rise Loan arose from the purchase of goods and services which were primarily for family, personal, or household purposes, specifically charges for consumer goods

---

[1] The bank has a small office in Sandy, UT and Garden City, NY but has no retail branches at these locations.

and services, and therefore meets the definition of *Debt* under the FDCPA, 15 U.S.C. § 1692a(5) and the FCCPA, Florida Statute § 559.55(6).

20.     Florida Statute § 687.071(3) renders loans made with annual interest rates greater than 45% a third-degree felony.

21.     Florida Statute § 687.071(7) renders any loan in violation of Florida Statute §687.701, and any debt stemming from such extension of credit, void and unenforceable.

22.     The annual interest rate on the Rise Loan exceeded **115% annually**.

23.     The loan made by Rise to Mr. Frazier was thus *void ab initio. See Stubblefield v. Dunlap*, 148 Fla. 401, 4 So.2d 519 (1941); *Pushee v. Johnson*, 123 Fla. 305, 166 So. 847 (1936); *River Hills, Inc. v. Edwards*, 190 So.2d 415 (Fla. 2d DCA 1966). *Richter Jewelry Co. v. Schweinert*, 169 So. 750, 758-59 (Fla. 1935) (criminally usurious loans are "void as against the public policy of the state as established by its Legislature.")

24.     The Rise loan is therefore an *unlawful debt* pursuant to Florida Statute §772.102(2).

25.     Florida law prohibits any recovery of the principal on such loans. *Rollins v. Odom*, 519 So. 2d 652, 656 (Fla. Dist. Ct. App. 1988).

### Rise's Questionable History

26.     Rise is a Fort Worth, Texas-based "FinTech" business that makes loans to consumers at interest rates which are illegal in the vast majority of states, including Florida.

27.     One of the founders of Rise was Ken Rees ("**Rees**") who was, until his resignation in July 2019, also its CEO.

28.     Rees was previously the CEO of Think Finance, LLC ("**Think Finance**"), which made consumer loans at triple-digit interest rates.

29.     Initially, Think Finance partnered with the First Bank of Delaware to launder its loans, creating the appearance that the loans were issued by a state-chartered bank so as to avoid state usury laws.[2]

30.     In 2012, the First Bank of Delaware was stripped of its banking charter and fined $15 million for engaging in various fraudulent schemes and money laundering.

31.     Rees and Think Finance thereafter partnered with the Chippewa Cree Tribe of the Rocky Boy's Indian Reservation in Box Elder, Montana, and began laundering their loans – now re-branded "Plain Green Loans" – through the Tribe, claiming the Tribe's sovereign immunity prevented civil and criminal prosecution of state usury laws. Such agreements are often referred to as "rent-a-tribe" schemes.

32.     Plain Green's loans charged interest rates of up to 400% annually.

33.     After lawsuits were filed against Think Finance by the Consumer Financial Protection Bureau, the Pennsylvania Attorney General, and others, relating to Plain Green Loans' usurious interest rates, Rees formed **Elevate**.

## Rise Engages in Rent-a-Bank Scheme with FinWise

34.     Through Elevate, Rise partnered with FinWise to avoid state usury laws.

35.     FinWise, as a bank, is not subject to state interest rate limits pursuant to the National Bank Act.

36.     Further, Utah has no maximum legal interest rate enshrined in its state law.

37.     Rise launders its loans through FinWise, claiming that FinWise is the true lending entity.

---

[2] 12 U.S.C. §85. "Section 85 of the National Bank Act (NBA) allows federally chartered banks to 'export' the maximum interest rates of their "home" states, meaning they can charge those rates when lending to borrowers in other states with stricter usury laws." Congressional Research Service – See crsreports.congress.gov/product/pdf/LSB/LSB10512, visited on March 28, 2021.

38.     However, FinWise was not the true lender of Mr. Frazier's loan.

39.     Indeed, FinWise had virtually nothing to do with the marketing, underwriting, servicing, collection, and post-charge-off sale to Defendant NCA.

40.     Moreover, at no point was any of FinWise's own capital actually at risk.

41.     FinWise is only paid a small portion for its role in Rise's lending.

42.     At all times relevant, Elevate EF SPV ("**EF SPV**"), a Cayman Islands special purpose vehicle which operates for the financial benefit of Elevate, purchased a 96% interest in the receivables for the Rise loans, including principal and interest due.

43.     This 96% interest makes EF SPV the legal and equitable owner of the receivables for the Rise loans.

44.     Elevate is the primary beneficiary of EF SPV, and it receives the income generated from this 96% ownership interest.

45.     Elevate substantially controls and manages EF SPV and absorbs its losses, should any be incurred.

46.     Elevate is the entity whose capital is at risk if a consumer loan goes bad.

47.     FinWise contributes, at absolute maximum, 4% of the capital of any consumer loan.

48.     Thus, FinWise contributed $140 or less to fund Mr. Frazier's loan, while Elevate contributed $3,360 or more.

49.     Elevate provides credit protection to EF SPV against Rise loan losses. This credit protection places the risk of loss on Elevate.

50.     Additionally, FinWise's economic interests are protected due to its agreement with Elevate, which includes a stipulation that EF SPV maintain cash collateral in a FinWise account to secure its obligations to purchase the Rise loans supposedly made by FinWise.

51.     Elevate, through ones of its subsidiaries, also acts as the servicer for the Rise loans. Elevate reconciles the accounts, posts payments and other credits to the accounts, and provides periodic billing statements to consumers.

52.     As per Rise's business model, once FinWise "made" the $3500 loan to Mr. Frazier, the loan was immediately assigned to Rise.

53.     Rise then proceeded to attempt to collect the loan – including the usurious interest – from Mr. Frazier.

54.     However, Rise, a non-bank assignee of the Rise Loan, had no legal ability to collect the assessed interest. *See Madden v. Midland Funding, LLC*, 786 F.3d 246 (2d Cir. 2015).[3]

55.     Rise has been sued in the past for collection of unlawful debt and its use of FinWise in its "rent-a-bank" schemes. *See District of Columbia vs. Elevate Credit, Inc.*, case 1:2020cv01909, U.S.D.C., District of Columbia, July 2, 2020.

### NCA Attempts to Collect Usurious Rise Loan from Mr. Frazier

56.     Mr. Frazier made at least $738 of payments on the Rise Loan after obtaining the loan in December 2019.

---

[3] *But see* Department of the Treasury Final Rule 1557-AE73, Published June 2, 2020 - https://occ.gov/news-issuances/federal-register/2020/85fr33530.pdf, allowing exportation of a bank's right to issue / collect loans pursuant to its local laws to a subsequent purchaser of those rights. Such interpretation, however, is not binding on this court and allows anomalous results as in the current matter where a non-bank makes an arrangement specifically to avoid usury laws, using the bank as a straw-man, avoiding actual bank oversight and ostensibly allowing consumer deception.

57. By March 2020, Rise claimed Mr. Frazier owed $4,144 – $644 more than he originally borrowed 90 days earlier.

58. Around May 2020, Rise sold the Rise Loan to NCA (the "**Debt**").

59. NCA, pursuant to 15 U.S.C. § 1692g, thereafter mailed Mr. Frazier a collection letter, seeking to collect the Debt.

60. NCA also reported the purported Debt to *Consumer Credit Reporting Agencies* ("**CRAs**"), including Experian, monthly, beginning July 2020. **SEE PLAINTIFF'S EXHIBIT B.**

61. Reporting a debt to a CRA is an attempt to collect the debt alleged therein. *See, e.g., Edeh v. Midland Credit Management, Inc.,* 748 F. Supp. 2d 1030 (D. Minn. 2010) ("The Court has learned, through its work on countless FDCPA cases, that threatening to report and reporting debts to CRAs is one of the most commonly-used arrows in the debt collector's quiver.")

62. NCA certified to the CRAs that the Debt it was reporting was "in collection," with $4,224 past due, thereby indicating that the Rise Loan was a legitimate, lawful debt.

63. NCA knew, or should have known, that it was collecting an illegal debt from Mr. Frazier.

64. NCA is a large debt buyer with a number of experienced lawyers advising it on consumer protection statutes.

65. NCA purchases a large amount of unlawful debt from lenders including Rise, at a tiny fraction of face value, and then attempts to collect the full-face value of those debts from consumers like Mr. Frazier.

66.     Further, NCA was in possession of the original loan agreement documents that created the purported Debt.

67.     On information and belief, the usurious interest rate was printed in large, bold type on the *Truth in Lending Act* ("TILA") disclosure included in the loan agreement documents.

68.     Mr. Frazier's credit reports and scores have been severely and adversely impacted from NCA's false reporting that he legitimately owes a debt in excess of $4,000 to NCA.

### NCA Engages in Campaign of Harassment and False Threats

69.     Beginning around June 2020 and through April 2021, agents from NCA frequently called Mr. Frazier and attempted to collect the Debt.

70.     In every call, NCA claimed the Debt was legally enforceable against Mr. Frazier.

71.     In many calls, NCA explicitly threatened to sue Mr. Frazier within 48 hours if he did not pay the Debt.

72.     NCA threatened that it would seize and garnish Mr. Frazier's wages, car, and other personal items.

73.     In at least one instance, NCA claimed it already had sued Mr. Frazier and obtained judgment.

74.     At no point did NCA sue Mr. Frazier, nor did it so much as contemplate suing him.

75.     NCA had no legal ability to sue Mr. Frazier for the Debt since it was *void ab initio* and unenforceable against him.

76.     NCA called Mr. Frazier's relatives, including his mother, and claimed Mr. Frazier had an unpaid debt owed to NCA and that NCA would sue him for it soon if it was not paid.

77.     NCA claimed that Mr. Frazier had committed "bank fraud" by not paying the Debt back.

78.     At no point did Mr. Frazier consent to the disclosure of any information about any purported debt he might owe to NCA to any third party, including his mother.

79.     In many of the calls, NCA's agents did not disclose the communication was from a debt collector; to the contrary, NCA implied the communication was from someone other than a debt collector, *e.g.*, an attorney-at-law or someone associated with one.

80.     NCA's threats constitute extortion pursuant to Florida Statute § 836.05, as NCA made malicious threats to injure the reputation of Mr. Frazier by suing him for a debt which it knew was unenforceable against him, accusing him of committing the crime of "bank fraud," and threatened his property (*e.g.*, his wages and car), and maliciously threatened to expose him to disgrace (*e.g.*, calling Mr. Frazier's mother and telling her that her son would be sued and/or arrested for "bank fraud").

81.     NCA has a history of such abusive behavior and has been subject to multiple actions by state regulatory authorities over its attempts to collect on illegally-issued consumer loans.

82.     For example, NCA was sued in July 2012 by the Arkansas State Attorney General for collecting on payday loans issued to Arkansas consumers in violation of Arkansas law. As part of the settlement with the attorney general, NCA cancelled collection on $2.7 million in loans and paid $200,000 to the state.

83.     In November 2014, NCA was named as a co-defendant in a lawsuit by the Pennsylvania Attorney General filed against several internet-based payday loan lenders claiming affiliation with Native American tribes. The suit claimed the loans were illegal under

Pennsylvania law and alleged that NCA attempted to collect many of these payday loans, despite knowledge such loans were illegal.

84.     In January 2015, NCA settled with the New York City Department of Consumer Affairs, in which it agreed to pay $962,800 in consumer restitution to over 4,000 residents of New York City from whom it had collected payment from loans it purchased from unauthorized payday loan lenders. It also paid a $350,000 fine and was banned from collecting debt in New York City for six years.

85.     Close to 100 other lawsuits have been filed against NCA for its collection of consumer loans made under illegal terms.

86.     Many of these lawsuits allege NCA threatened to accuse the consumers of criminal offenses if they did not pay the purported debts, despite the fact the consumers had violated no criminal statutes. *See, e.g., Williams v. Nat'l Credit Adjusters, LLC*, No. 4:14CV267 CDP (E.D. Mo. Nov. 16, 2015) (NCA accused of using racial slurs, profanity, and threats of arrest to collect $500 payday loan).

87.     In 2018, NCA entered into a consent order and agreed to pay a $3 million penalty to the Consumer Financial Protection Bureau ("**CFPB**") concerning its debt collection tactics. The CFPB alleged that NCA, directly and via agents under its control and with NCA's knowledge, engaged in illegal debt collection activities by "representing that consumers owed more than they were legally required to pay, or threatening consumers and their family members with lawsuits, visits from process servers, and arrest, when neither NCA nor the collection companies intended or had the legal authority to take those actions." *In the Matter of: National Credit Adjusters, LLC and Bradley Hochstein*, Administrative Proceeding, File No. 2018-BCFP-0004, July 13, 2018.

88.     At all times relevant, Rempel, as CEO of NCA, instructed his agents and employees to attempt to collect the Rise Loan from Mr. Frazier.

89.     At all times relevant, Rempel, as CEO of NCA, authorized the purchase of bulk portfolios of debt from lenders including Rise, despite knowing the loans had been made at triple-digit interest rates through dubious "rent-a-bank" schemes.

90.     At all times relevant, Rempel, as CEO of NCA, authorized the illegal collection methods employed by NCA against Mr. Frazier.

91.     Mr. Frazier suffered severe emotional distress in being subjected to illegal and abusive collection actions by NCA concerning a loan that he does not legally owe.

92.     Mr. Frazier has hired the aforementioned law firm to represent him in this matter and has assigned his right to fees and costs to such firm.

## COUNT I
## VIOLATIONS OF THE FDCPA

93.     Mr. Frazier adopts and incorporates paragraphs 1 – 92 as if fully stated herein.

94.     The Defendants violated **15 U.S.C. § 1692c(b)** when NCA intentionally disclosed that Mr. Frazier supposedly owed a debt to NCA to third parties, including Mr. Frazier's mother, claiming legal action would be taken against him if he did not pay.

95.     The Defendants violated **15 U.S.C. § 1692e and 1692e(10)** when NCA used misleading and deceptive means to attempt to collect a debt by: (a) attempting to collect the Debt from Mr. Frazier, a Florida resident, in writing, over the phone, and via credit reporting, claiming a debt from an unlicensed, non-bank entity, Rise, bearing annual interest exceeding 115%, was a legal, valid, and enforceable debt, when the Rise Loan was null, void, and unenforceable under Florida law; (b) claiming NCA would – and could – sue Mr. Frazier for the Debt, when it had no

intention of suing him and legally could not sue him for it; (c) claiming his wages could be garnished and property seized for non-payment; and, (d) claiming Mr. Frazier had committed "bank fraud" for not repaying the Debt.

96.     The Defendants violated **15 U.S.C. § 1692e(2)(a)** when NCA made a false representation about the character, amount and/or legal status of a debt by: (a) attempting to collect the Debt from Mr. Frazier, a Florida resident, in writing, over the phone, and via credit reporting, claiming a debt from an unlicensed, non-bank entity, Rise, bearing annual interest exceeding 115%, was a legal, valid, and enforceable debt, when the Rise Loan was null, void, and unenforceable under Florida law; (b) claiming NCA would – and could – sue Mr. Frazier for the Debt, when it had no intention of suing him and legally could not sue him for it; (c) claiming his wages could be garnished and property seized for non-payment; and, (d) claiming Mr. Frazier had committed "bank fraud" for not repaying the Debt.

97.     The Defendants violated **15 U.S.C. § 1692e(4)** when NCA claimed that Mr. Frazier's wages could be garnished and his property seized for non-payment, and that Mr. Frazier had committed "bank fraud" for not repaying the Debt and thus faced arrest, when NCA had no intention of suing Mr. Frazier and legally could not sue him for the Debt, nor had Mr. Frazier committed any kind of "bank fraud."

98.     The Defendants violated **15 U.S.C. § 1692e(5)** when NCA threatened action which could not legally be taken, to wit, claiming that Mr. Frazier's wages could be garnished and his property seized for non-payment, and that Mr. Frazier had committed "bank fraud" for not repaying the Debt and thus faced arrest. NCA had no intention of suing Mr. Frazier and legally could not sue him for the Debt, and Mr. Frazier had not committed any kind of "bank fraud."

99.    The Defendants violated **15 U.S.C. § 1692e(7)** when NCA claimed Mr. Frazier had committed a crime when he had not, to wit, claiming that nonpayment of the purported Debt constituted "bank fraud."

100.   The Defendants violated **15 U.S.C. § 1692e(8)** when NCA communicated credit information which it knew to be false, to wit, that a debt from an unlicensed, non-bank entity, Rise, bearing annual interest exceeding 115%, was a legal, valid, and enforceable debt, and that Mr. Frazier thus actually owed the $4,000-plus balance, when he did not owe it as it was null, void and unenforceable against him pursuant to Florida law.

101.   The Defendants violated **15 U.S.C. § 1692e(11)** when NCA failed to disclose that its communications were from a debt collector.

102.   The Defendants violated **15 U.S.C. § 1692f** when NCA engaged in an orchestrated scheme to harass Mr. Frazier, disclosing the Debt to his mother and other relatives, threatening to sue Mr. Frazier for the Debt when NCA knew it had no ability to do so, threatening wage garnishment, and seeking criminal remedies if he did not pay.

103.   The Defendants violated **15 U.S.C. § 1692f(1)** when NCA attempted to collect an amount not authorized by contract or law, to wit, the entire purported Rise Loan debt from Mr. Frazier, through written demands, phone calls, and credit reporting, when the Rise Loan was null, void, and unenforceable under Florida law.

104.   The above stated violations were committed pursuant to policies put in place by Rempel and subject to his day-to-day oversight.

105.   Rempel is therefore jointly and severally liable with NCA. *See Fed. Trade Comm'n v. Moses*, 913 F.3d 297 (2d Cir. 2019).

106.   The Defendants' conduct renders them liable for the above-stated violations of the FDCPA.

**WHEREFORE,** Mr. Frazier respectfully requests that this Honorable Court enter judgment against NCA and Rempel, jointly and severally, for:

a.   Statutory damages of **$1,000.00**, pursuant to 15 U.S.C. § 1692k(a)(2)(A);

b.   Actual damages of at least **$10,000**, pursuant to 15 U.S.C. § 1692k(a)(2)(A);

c.   Reasonable costs and attorneys' fees pursuant to 15 U.S.C. § 1692k(a)(3); and,

d.   Such other relief that this Court deems just and proper.

## COUNT II
## VIOLATIONS OF THE CRCPA

107.   Mr. Frazier adopts and incorporates paragraphs 1 – 92 as if fully stated herein.

108.   Rempel violated **Florida Statute §§ 772.103(1) and 772.103(2)** in that he knowingly participated in, and was employed by and/or associated with, an enterprise engaged in an ongoing pattern of criminal activity – extortion of consumers like Mr. Frazier. Indeed, over a decade of lawsuits and complaints make clear that NCA collects debt by extorting consumers – claiming NCA will accuse them of criminal acts if debts are not paid, and/or by damaging their reputations by informing the employer of the consumer s/he faces legal troubles for purportedly unpaid debts. NCA simply banks on consumers *not knowing* its threats are hollow. The fact that dozens of different NCA agents have made virtually identical threats to consumers over a period of many years heavily suggests a scheme orchestrated by a mastermind, *e.g.*, Rempel.

109.   The Defendants violated **Florida Statute §.772.103(3),** when they participated in an association with Elevate Credit, doing business as Rise Credit, through the collection of an unlawful debt – the Rise Loan.

110.   The Defendants violated **Florida Statute § 772.103(4)** when they conspired and endeavored, with Rise and FinWise, to collect an unlawful debt – the Rise Loan – and to use any funds collected in furtherance of NCA's ongoing enterprise.

111.   The Defendants took action in furtherance of this conspiracy, including mailing a collection letter and reporting it to the nationwide CRAs as a purported unpaid debt, damaging Mr. Frazier's credit and, in effect, holding his credit report hostage until he paid the unlawful debt, threatening Mr. Frazier with spurious civil and criminal action, disclosing the Debt to Mr. Frazier's mother and other relatives – thus making clear the Defendants had no compunction with continuing to slander Mr. Frazier to other people Mr. Frazier knew if he did not pay.

112.   The Defendants have attempted to collect virtually-identical debts through credit reporting, phone calls, demand letters, and threats of litigation from hundreds, if not thousands, of other Florida residents.

**WHEREFORE,** Mr. Frazier respectfully requests this Honorable Court enter judgment against NCA and Rempel, jointly and severally, ordering:

a.   Threefold the amount of actual damages, or, in the alternate, the statutory minimum of $200, whichever is greater, pursuant to Florida Statute § 772.104(1);

b.   Reasonable costs and attorneys' fees pursuant to Florida Statute § 772.104(1);

c.   An injunction of Estoppel against NCA from engaging in any further action in violation of Florida law, pursuant to Florida Statute § 772.14; and,

d.   Any other relief this Court deems equitable and proper under the circumstances.

## COUNT III
## VIOLATIONS OF THE FCCPA

113.   Mr. Frazier adopts and incorporates paragraphs 1 – 92 as if fully stated herein.

114.   The Defendants violated **Florida Statute § 559.72(5)** when NCA disclosed information to an unauthorized third party that would affect Mr. Frazier's reputation, with knowledge or reason to know that the person does not have a legitimate business need for the information or that the information is false, by intentionally disclosing information about the purported Debt to third parties, including Mr. Frazier's mother, claiming legal action would be taken against him if he did not pay.

115.   The Defendants violated **Florida Statute § 559.72(9)** when NCA attempted to collect the Rise Loan from Mr. Frazier via multiple collection letters mailed to him, when the Rise Loan was illegitimate and unenforceable due to the application of interest rates in excess of 115% percent annually on the principal amount of the loan, in violation of Florida Statute §687.071, and NCA knew, or should have known, that the Rise Loan was unenforceable in Florida.

116.   The Defendants violated **Florida Statute § 559.72(9)** when NCA asserted rights which do not exist, specifically, the right to collect the Rise Loan from Mr. Frazier, when the loan was not legally owed pursuant to Florida law, and the right to sue Mr. Frazier in court for an unenforceable debt.

117.   The Defendants violated **Florida Statute § 559.72(11)** when NCA orally communicated in such a way as to create the false impression it was a law firm, or was affiliated with a law firm, when it is not.

118.   NCA was in possession of the original loan documents and thus knew, or should have known, that the loan contained an illegal interest rate in Florida.

119.   The above stated violations were committed pursuant to policies put in place by Rempel and subject to his day-to-day oversight.

120.    Rempel is therefore jointly and severally liable with NCA. *See Fed. Trade Comm'n v. Moses*, 913 F.3d 297 (2d Cir. 2019).

121.    **WHEREFORE,** Mr. Frazier respectfully requests this Honorable Court enter judgment against NCA for:

a.      Statutory damages of **$1,000.00** pursuant to Florida Statute § 559.77(2);

b.      Actual damages pursuant to Florida Statute § 559.77(2);

c.      Injunctive relief preventing NCA from attempting to collect the alleged loan from Mr. Frazier pursuant to Florida Statute § 559.77(2);

d.      Reasonable costs and attorneys' fees pursuant to Florida Statute § 559.77(2); and,

e.      Such other relief that this Court deems just and proper.

<u>**DEMAND FOR JURY TRIAL**</u>

Mr. Frazier hereby demands a trial by jury on all issues so triable.

Respectfully submitted on **May 25, 2021**, by:

> **SERAPH LEGAL, P. A.**
>
> /s/ *Brandon D. Morgan*
> Brandon D. Morgan, Esq.
> Florida Bar # 1015954
> bmorgan@seraphlegal.com
>
> /s/ *Thomas M. Bonan*
> Thomas M. Bonan, Esq.
> Florida Bar # 118103
> tbonan@seraphlegal.com
>
> 1614 N. 19th St.
> Tampa, FL 33605
> Tel: 813-567-1230
> Fax: 855-500-0705
> *Attorneys for Plaintiff*

**<u>ATTACHED EXHIBIT LIST</u>**
A        NCA's Florida CCA License Record
B        Plaintiff's Experian Consumer Disclosure, January 7, 2021, Excerpt

**EXHIBIT A**
## NCA's Florida CCA License



Florida Office of Financial Regulation

Login

**License Details**

Press "Search Results" to return to the Search Results list.

Press "New Search Criteria" to do another search of this type.

Press "New Search" to start a new search.

| License Number: CCA0900486 | | Current Date: 05/12/2021 04:32 PM |
|---|---|---|
| Name: | NATIONAL CREDIT ADJUSTERS LLC | |
| License Type: | Consumer Collection Agency | |
| License Status: | Current Active Registration | |
| License Status Effective Date: | 10/29/2020 | |
| Expiration Date: | 12/31/2021 | |
| Original Date of Licensure: | 04/08/2005 | |

**Addresses**

| Business Main Address | Address | 327 W. 4TH AVE<br>HUTCHINSON , KS<br>RENO<br>67501<br>US<br>View on a map |
|---|---|---|
| | Phone Number: | (620) 665-7708 |
| Mailing Address | Address | 327 W. 4TH AVE<br>HUTCHINSON , KS<br>RENO<br>67501<br>US<br>View on a map |

Search Results   New Search Criteria   New Search   Print

© 2018. MicroPact Version:2.11.6.62 (ficlr 235)

# EXHIBIT B
## Plaintiff's Experian Consumer Disclosure, January 7, 2021, Excerpt

1/7/2021                                    Experian - Access your credit report



| Account name | Account number | Recent balance | Date opened | Status | + Dispute |
|---|---|---|---|---|---|
| NATIONAL CREDIT ADJUSTERS, LLC | | $4,224 as of 01/01/2021 | 05/2020 | Collection account. $4,224 past due as of Jan 2021. | |

327 W 4TH AVE
HUTCHINSON, KS 67501
888 768 0674
**Address identification number**
0076139313

**Original creditor**
FINWISE BANK C/O RISE

**Type**
Debt Buyer
**Terms**
1 Months

**On record until**
Sep 2026

**Credit limit or original amount**
$4,224
**High balance**
$0
**Monthly payment**
$0
**Recent payment amount**
$0

**Date of status**
05/2020
**First reported**
07/2020
**Responsibility**
Individual

**Comment**
Account information disputed by consumer (Meets requirement of the Fair Credit Reporting Act).
**Reinvestigation information**
This item remained unchanged from our processing of your dispute in Dec 2020.

**Account history**

2021  2020
Jan  Dec  Nov  Oct  Sep  Aug  Jul

# EXHIBIT B
## Plaintiff's Experian Consumer Disclosure, January 7, 2021, Excerpt

**Payment history guide**

Collection as of Jul 2020 to Jan 2021

**Balance history**

The following data will appear in the following format:
Date: account balance / date payment received / scheduled payment amount / actual amount paid
Dec 2020: $4,224 / No data / No data / No data
Nov 2020: $4,224 / No data / No data / No data
Oct 2020: $4,224 / No data / No data / No data
Sep 2020: $4,224 / No data / No data / No data
Aug 2020: $4,224 / No data / No data / No data
Jul 2020: $4,224 / No data / No data / No data
The original amount of this account was $4,224